**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,               ) | |
|       Plaintiff,               ) | |
|                  ) | No. CR 16-511-TUC-CKJ |
| vs.                                              ) | **ORDER** |
| Oscar Jesus Ruiz-Hernandez,        ) | |
|       Defendant.               ) | |

Pending before the Court is the Motion to Suppress (Doc. 50) filed by Oscar Jesus Ruiz-Hernandez ("Ruiz-Hernandez"). A Response (Doc. 54), a Supplemental Memorandum (Doc. 64) and a Response to Supplemental Memorandum (Doc. 66) have been filed. Evidence and argument were presented to the Court on February 13, 2017.

I. *Factual and Procedural History*

A. *Agreements of the Parties*

During the February 13, 2017, hearing, counsel for Ruiz stated that he agreed the statistical summary provided by the government regarding immigration and narcotic-related events and other arrests at the checkpoint at issue in this case is accurate. Ex. 14; *see also* Response (Doc. 54), p. 7.

Counsel also agreed that the fact that the Arizona state route 80 ("SR80") checkpoint is within 100 air miles of the international border is not in dispute and is in compliance with relevant federal regulations.

B.  *Summary of the Testimony of Helso Lara*

Immigration and Customs Enforcement ("ICE") Officer Helso Lara ("'Agent Lara") previously served as a Border Patrol Agent for approximately six years.[1]  He was trained at the United States Border Patrol Agent Academy in Artesia, New Mexico and received course work in immigration law, nationality law, seizures (including the Fourth Amendment), TAC weapons, and tactics instruction.  Officer Lara was previously a legal facilitator in the United States Marine Corps and an investigative assistant for the Naval Criminal Investigative Services.

Officer Lara was assigned to checkpoint duty for approximately one year to one year and three months during 2012-2013 and 2015-2016; each rotational assignment lasted three to six months.  On February 19, 2016, he was assigned as a Border Patrol agent to work the SR80 checkpoint.  The SR 80 Checkpoints is approximately five miles north of Tombstone, between Tombstone and Benson.  It is at approximately where SR80 intersects with Arizona state route 82 ("SR82").  The checkpoint is approximately 40 to 50 miles from the international border.  There are signs (about one to two miles south of the checkpoint) notifying persons approaching the checkpoint that an immigration checkpoint is ahead and signs to incrementally reduce speed.

Persons/vehicles entering the checkpoint present themselves in an area where there is a stop sign.  A primary agent stands in that primary inspection area.  When a vehicle comes to the primary inspection area, Agent Lara, as a primary inspection officer, questions the occupants about their immigration status; i.e., he asks them their citizenship and ask them to present documents if they are not U.S. citizens.  Once a person is established to be legally in the country, Agent Lara would complete the encounter. If an agent has suspicion to look further into the vehicle, the vehicle/occupants are referred to the secondary inspection area. For example, such a referral may occur for safety reasons or if a canine has provided a basis for a referral.  Canine teams patrol before the primary inspection area.

---

[1]Although this witness is now Officer Lara, the Court will refer to him as Agent Lara as he was a Border Patrol Agent at the time of the incident.

On February 19, 2016, Agent Lara was assigned to the primary inspection area and primary duties. At approximately 6:50 a.m., the canine team moved from the pre-primary inspection area (to return to the station).[2] The canine could be seen leaving the pre-primaty area. Approximately, 30 seconds later, a 2008 Chevy Impala quickly approached the checkpoint. The agent had not seen the vehicle stop elsewhere as if waiting for an opportune time to enter the checkpoint. Although Agent Lara thought the timing of the vehicle with the leaving of the canine was a little strange, he could not necessarily connect the two events.

Agent Lara asked the driver if he was a U.S. citizen.[3] The driver looked a little nervous – he looked straight ahead and was grabbing the steering wheel. After the driver responded that he was a resident and not a U.S. citizen, Agent Lara asked to see his documents. The driver provided his permanent resident card to the agent. The card identified the driver as Ruiz-Hernandez. During this time, the agent felt that Ruiz-Hernandez was in a hurry. There was no eye contact between the agent and Ruiz-Hernandez and one hand of Ruiz-Hernandez continued to tightly grip the steering wheel.

While Agent Lara was inspecting the card, he asked Ruiz-Hernandez where he was going – the driver responded that he was going to Tucson. Agent Lara had not completed his inspection of the card (checking the holograms, attempting to ensure the card was valid)[4], when, within one minute of Ruiz-Hernandez stopping at the checkpoint, he asked if he could have consent to look inside the trunk. He did not believe that there was anything in the trunk that would help him ascertain whether Ruiz-Hernandez was legally within the United States. Agent Lara used a normal speaking tone, but was wearing a uniform and had a holstered weapon. The agent did not threaten Ruiz-Hernandez and did not raise his voice. Agent Lara

---

[2]It was still a little dark outside, but stadium lights illuminated the checkpoint area.

[3]Agent Lara, who is bilingual, does not recall if he asked the questions in English or Spanish. It is his practice to first use English, but if a person responds in Spanish, he will then continue the conversation in Spanish.

[4]The agent could not recall, but believed that all he had yet to do in his inspection of the card was to check to see whether the card had expired.

testified as follows:

> Q.    I guess just as a final question, why did you ask the defendant for consent to search his trunk?
>
> A.    Why?
>
> Q.    Yes.
>
> A.    Just because of his nervousness.  And you know, if he would have said no, he would have -- he would have been free to go.  I just felt like there was too much nervous energy at one point that I just asked him.  I didn't have any tools with me, so the only thing I could do is ask for consent.

Transcript of February 13, 2017, Hearing (Doc. 68) ("TR"), pp. 38-39.

Ruiz-Hernadez responded yes to the request to look in the trunk.  He either pulled a trunk release lever or pushed a trunk release button; i.e., the driver unlatched the trunk from inside the vehicle.  If Ruiz-Hernadez had not consented to the search, the agent would have ensured the card was valid, returned the card, and told Ruiz-Hernandez he was free to go. Agent Lara went to the rear of the vehicle, opened the trunk, and saw overflowing packages of marijuana.  Not only was the odor of marijuana readily identifiable, but the packages were similar to ones Agent Lara had previously seen used for packaging marijuana.  There were 193 packages of marijuana, weighing approximately 301 pounds.

## C.  *Summary of the Testimony of Raleigh Leonard*

Raleigh Leonard ("Deputy Chief Leonard") is the Acting Deputy Chief of Tucson Sector Border Patrol.  The Department of Homeland Security, Customs and Border Protection include the Office Air/Marine, Office of Field Operations, and Border Patrol agents (immigration officers).

Deputy Chief Leonard joined the Border Patrol in February of 1991.  In 2006 he accepted a promotion to the Yuma Sector.  Deputy Chief Leonard was assigned checkpoint duties in San Diego, California, and Yuma, Arizona, in the mid 1990s to early 2001 or 2001. While performing those duties, he inquired of the citizenship or nationality of persons.  He also asked people if they could produce documents that permitted their presence in the United States.  When provided with such documentation, Deputy Chief Leonard would

inspect the documents.

He transferred to the Tucson Sector in 2008 as a Division Chief. He has been assigned to stations in California, completed a few tours in Washington, D.C., and toured Iraq. Deputy Chief Leonard has held every position from a GS-5 to a GS-15 in the Border Patrol.

The Tucson Sector uses an integrated, multilayered approach to border security. There is an interdependent relationship between the checkpoints and the immediate border, between the checkpoints and the ports of entry, and between the checkpoints and the Border Patrol stations.[5] There is a front line deployment of personnel, technology, and tactical infrastructure. The second line of defense consists of personnel and technology. There are also border checkpoints along the 262 linear border miles from Yuma County to the New Mexico state line. In the 90,000 square miles, there are eight Border Patrol stations and 11 Border Patrol checkpoints. With the exception of one, each major route of egress has a Border Patrol checkpoint on it.[6] There are nearly 4,000 Border Patrol agents in the Tucson Sector. In other words, Border Patrol agents seek to prevent the further entry into the United States of undocumented people by using horses, ATVs, aircraft, and checkpoints to make the area a containment zone. Without checkpoints, roving patrol stops and agents in vehicles would have to be used, which does not work well for the Border Patrol. Such methods result in people fleeing from the agents, vehicle accidents, damage to private property, and innocent persons being injured or killed. Checkpoints are manned 24 hours a day, seven days a week, although they are occasionally closed due to inclement weather and/or staffing shortages.

The Tucson Sector command staff, with input from the Border Patrol Headquarters, determine where checkpoints are located. They look for an area that is straight (avoiding a blind curve in case traffic backs up), not in the middle of a major metropolitan city, and where it would cut off all smaller routes of egress away from the border. Deputy Chief

---

[5]The Office of Field Operations, rather than the Border Patrol, operates the ports of entry.

[6]On the eastern side of the state, CBP is working with the Arizona Department of Transportation to place an additional checkpoint.

Leonard testified:

> So Tucson Sector would be responsible for the strategy as far as what do you need to further contain that particular area?  And then we would reach out to Washington, D.C. and ask them for the resources so that we could establish a checkpoint.  But we would also have to negotiate with community members and get their permission, negotiate with the Arizona Department of Transportation to get their authority, their permission. So it's a long, drawn-out process, but the strategy is devised at the local level.

TR, p. 84.

The SR80 checkpoint is located a little north of Tombstone and a little south of Benson.  It is 61 miles from the immediate border.  This checkpoint deals with people going northbound from Naco, Bisbee, and Douglas  and includes a lot of tourists from Bisbee and Tombstone.  All the agents stationed at the checkpoints have been trained at the Border Patrol academy.  They are Border Patrol agents, but their position description is immigration officers.  The Border Patrol agents are evaluated on a matrix related to immigration results and are trained in immigration law, nationality law, statutory law, and criminal law with a priority toward immigration law.  They are also trained how to inspect various forms of identification and have some expertise in determining if documents are valid.

Referring to a map, *see* Ex.16, from February 20, 2015 through November of 2016, the vast majority of enforcement events took place along the immediate border in the Brian A. Terry station's area of responsibility.[7]  Red dots on the map, representing immigration-related events, show most enforcement events along the border, with a smattering of red dots to the north closer to the checkpoint.  Deputy Chief Leonard stated:

> And I'd like to point out, you see the Highway 80 checkpoint, the one we're talking about today, we look at all the immigration enforcement activities that took place in proximity to this checkpoint as people, from our intell (sic) indicates, that they're dropped off and asked to walk around the checkpoint to circumvent the Border Patrol agents at this checkpoint which is why you see all of the enforcement, the immigration enforcement activity here with a smattering of narcotic enforcement activity.  And then you see quite a bit of immigration enforcement activity here with also a smattering of narcotic-related events.

TR, p. 53.  The map also identifies narcotic-related events with green diamonds and weapons-related events with circles with guns in them.  Event symbols are stacked upon

---

[7]This station was formerly known as the Naco Station.

other event symbols. Further, some of the red dots represent multiple persons in a group. Events represented by gray symbols are enforcement events that were outside the area of responsibility for the Brian A. Terry Station.

Within the last two to three months, cameras have been placed at the SR80 checkpoints. The cameras were added to address complaints regarding traffic backing up or vehicles being held too long.

The SR80 checkpoint is located just north of SR82, as opposed to further south closer to Tombstone, to prevent people from using SR82 to circumvent the checkpoint. The red dots on the map show people who have been dropped off about 60 miles north of the border and who are trying to walk around the checkpoint to avoid the Border Patrol agents at the checkpoint. The roving agents on horseback, ATVs, and four-wheel drive vehicles attempt to detect the people before they are able to reload into a vehicle.

According to the Arizona Department of Transportation, approximately 2,500 - 2,700 vehicles pass through the SR80 checkpoint in a 24-hour period. Deputy Chief Leonard did not dispute the calculation of the Assistant United States Attorney ("AUSA") that about one million vehicles travel through the checkpoint in one year.

At the primary area of the checkpoint, the agent performs the function of determining the alienage or citizenship of the occupants of the vehicles. The secondary inspection area is where people are referred if further examination of the documents, occupants, or vehicles is needed. In the secondary inspection area, occupants can disembark the vehicles safely and the agents can walk around the vehicles more safely with less risk of injury from other traffic. As the singular purpose of the checkpoints is for immigration inspections, the agents ask the occupants their citizenship or immigration status. If someone answers in the negative, the agents ask for documentation. Agents will sometimes waive persons through if the agents are familiar with them.

Every enforcement event, whether it results in an arrest or not, is entered into the Enforcement Information Database ("EID"), Border Patrol's database. This includes all apprehensions. When an apprehension occurs, the agents write a report and shortly thereafter

enter the information at the Wilcox Station where arrested persons are transported – these events may include multiple subjects. This occurs whether or not the case is referred to the U.S. Attorney's Office for prosecution. However, typical or consensual encounters are not entered into the database. The data is overseen by ICE, but Border Patrol and the Office of Field Operations have the ability to retrieve statistics from the EID. It is from this data that Exs. 16, 17, and 18 were created.

Deputy Chief Leonard summarized the statistics included in Exhibit 14, which provides:

**USBP Immigration and Narcotic Related Events at TCA's 80 Checkpoints**
**February 20, 2015 - November 20, 2016**

|  | CTN80 Checkpoint | |
|---|---|---|
|  | 02/20/2015 - 02/19/2016 | 02/20/2016 - 11/20/2016 |
| Immigration Related* Events | 33 | 11 |
| Immigration Related* Arrests | 72 | 17 |
| Narcotics Related Events | 67 | 38 |
| Narcotics Related Arrests | 89 | 44 |
| Narcotics Related, Non-Immigration Related* Arrests | 86 | 44 |
| Other Arrests (All Non-Immigration*) | 105 | 61 |

*Immigration Related included events with at least one of the following criteria:
- Incident type of AAS or CAS
- Includes a deportable alien
- Includes a subject presented for prosecution on an 8 USC 1324 charge

Ex. 14. Deputy Chief Leonard stated:

So the 105 nonimmigration arrests would also include the 86 narcotic-related nonimmigration-related arrests. And the same with the second column. The 61 all nonimmigration-related arrests would include the narcotic-related nonimmigration-related arrests.

TR, p. 68. The three-arrest difference between the Narcotics Related Arrests and the Narcotics Related, Non-Immigration Related Arrests reflect a narcotics-related event that also resulted in an immigration-related arrest. The difference between the Narcotics Related, Non-Immigration Related Arrests and the Other Arrests (All Non-Immigration) includes

1
2
3
4
5

outstanding arrest warrants, weapons-related arrests, etc.  The chart only includes those vehicles that resulted in an enforcement event; it does not include every one of the approximate 2,700 vehicles that travel through the checkpoint daily.  An arrest such as Ruiz-Hernandez's would be included as a narcotics-related arrest and a non-immigration-related arrest.

6
7
8
9
10

Transnational criminal activity includes both the alien smuggling organizations and the drug trafficking organizations; the activities sometimes overlap.  Deputy Chief Leonard stated:

> People are aware [the checkpoint's]  there, and they attempt to either go through it with: illegal aliens in the trunk; someone with a counterfeit doc; someone as an imposter where it's a valid document but they're posing as the person who is on the document and they're not that person; or a false claim to United States citizen.

11
12
13
14
15
16
17
18
19
20
21
22
23
24

TR, p. 70.  The chart does not include deterrence or the persons apprehended trying avoid the checkpoint by walking around it.  While Border Patrol considers the aforementioned statistics for the deployment of resources (personnel, technology, tactical infrastructure), it is an immigration checkpoint and is staffed by immigration officers who are performing an immigration check.  Deputy Chief Leonard believes the data surrounding the checkpoints bolsters the support for immigration checkpoints and shows the deterrent effect of the immigration checkpoints.   The checkpoints were deployed over a number of years, addressing displaced traffic from other checkpoints.  The use of checkpoints "is part of a multifaceted, multilayered, interdependent, integrated, enforcement strategy." TR, pp. 71-72. If the SR80 checkpoint were to be closed, an area of vulnerability would be created.  The entire area of responsibility is considered to determine the best areas to help displace and deflect traffic.  Replacing the checkpoint with roving agents would not be as effective as the checkpoint which stops every vehicle from traveling further into the country; the area would become the least or less-fortified area in the 262 miles of international border.

25
26
27

Deputy Chief Leonard is aware that, at the international border, vehicles may be completely inspected and taken apart, while people may be detained and questioned.  He recognizes the law is different once a person is beyond the border.  The checkpoint is a

28

second line of defense to the ports of entry.

Agents assigned to the primary inspection area do not wear video or audio recording devices.  Deputy Chief Leonard does not know if any checkpoints outside of the Tucson Sector utilize such recording devices.

In 2006, more than 600,000 apprehensions or arrests occurred and over one million pounds of narcotics flooded across the international border in the Tucson Sector.  At that time, there were less than 2,000 Border Patrol agents.  The government has expended significant resources in the Tucson Sector to contain the border.  There are now approximately 4,000 agents and there has been an  increase in technology and tactical infrastructure in the sector.  Three checkpoints were initially established in about 1999, but as Tucson became overwhelmed other checkpoints were established.  There have been 11 checkpoints since at least 2011.

D. *Summary of the Testimony of Oscar Ruiz-Hernandez*

Ruiz-Hernandez speaks English pretty well, but it is not his native language.  He is a legal permanent resident; he came to the United States in 1986 and attended school in San Diego, California.

Ruiz-Hernandez was arrested on February 19, 2016, at the SR80 checkpoint.  At the time, he was living in Agua Preita, Mexico, just south of Douglas, Arizona.  His wife and children live in Agua Prieta.  Ruiz-Hernandez was working in Tucson, driving heavy equipment.  He would sometimes commute daily, while at other times he would stay in either Tucson or Agua Prieta for two or three days at a time.

Ruiz-Hernandez approached the checkpoint on February 19, 2016, in the same manner as when he previously had approached the checkpoint.  He did not time his arrival to avoid the presence of a canine.  Ruiz-Hernandez was traveling at a normal rate of speed before he got to the checkpoint and recalls seeing the signs notifying of the approaching checkpoint. He reduced his speed when directed by the signs and, when a sign mandated a 15 miles per hour speed limit, he was traveling at 10 miles per hours.

Ruiz-Hernandez stopped at the stop sign.  He recognized Agent Lara at the hearing as the man at the checkpoint that day; Agent Lara had not been at the checkpoint when Ruiz-Hernandez had previously traveled through the checkpoint.  He had all of his windows rolled down so the agents could see the interior of the vehicle.  Agent Lara asked if he was a U.S. citizen or a permanent resident.  Ruiz-Hernandez stated he was a permanent resident.  The agent requested his card.  The vehicle remained in drive, with Ruiz-Hernandez's foot on the brake.  In retrieving the card from his left rear pocket, he took his left hand off of the steering wheel; he was leaning with his right hand between the two seats so he could access the pocket.  Ruiz-Hernandez demonstrated how he used both hands to remove the card from his wallet.

The agent did not look at the card, but told Ruiz-Hernandez to open the trunk within one second of having received the card.  The agent did not look at the card then Ruiz-Hernandez as if he were comparing the photograph to Ruiz-Hernandez's face.  After receiving the card but before directing Ruiz-Hernandez to open the trunk, the agent asked where Ruiz-Hernandez was going; Ruiz-Hernandez responded that he was going to Tucson.

Ruiz-Hernandez put the car in park so he could press the trunk release button.  The agent did not ask him whether he would open the trunk or tell him that he could not open the trunk if he so chose.  Ruiz-Hernandez stated:

> Q.     Why did you push the button that opened the trunk?
>
> A.     Because when he saw the card, he just saw the card and told me, "Open the trunk."  So I did.  So I followed the rules, the law.

TR, p. 98.

This was the first time an agent had told Ruiz-Hernandez to open the trunk in this manner; at other times, agents would ask if Ruiz-Hernandez was willing to open the trunk.  Agent Lara did not unholster his gun and did not threaten Ruiz-Hernandez.

A man had approached Ruiz-Hernandez at a gas station, asking Ruiz-Hernandez if he could drive Ruiz-Hernandez's car.  Ruiz-Hernandez does not know the name of the person, but knows he lives in Mexico; Ruiz-Hernandez knew him from when he was doing farm

laboring work.  Ruiz-Hernandez does not routinely lend his car to persons for whom he does not know their names; he does not know why he let the man drive the car that day.

If Ruiz-Hernandez were to be convicted in this case, he would lose his residency card.

E.  *Indictment and Pending Motion to Suppress*

On March 16, 2016, Ruiz-Hernandez was indicted for Conspiracy to Possess with Intent to Distribute Marijuana and Possession with Intent to Distribute Marijuana.

On January 30, 2017, Ruiz filed a Motion to Suppress (Doc. 50).  A Response (Doc. 54) has been filed.  Evidence and argument were presented to the Court on February 13, 2017. Additionally, a Supplemental Memorandum (Doc. 64) and a (Response (Doc. 66) have been filed.

II.  *Relevant Statistics Provided by the Government*

Based on the statistics provided by the government, during the 21-month period surrounding the arrest of Ruiz Hernandez, there were a total of 255 (72 + 17 + 105 + 61) arrests at the SR80 checkpoint.  Of these arrests, 89 (72 + 17) were immigration related, 133 (89 + 44) of them were narcotics related,[8] and 33 (255 - 89 - 133) were neither immigration nor narcotics related.  In other words, at the SR80 checkpoint from February 20, 2015 through November 20, 2016, 35 % of the arrests were immigration-related, 52% of the arrests were narcotics-related, and 13 % of the arrests were neither immigration nor narcotics related.  These statistics do not include arrests that occurred in the area immediately surrounding the checkpoint.

III.  *Constitutionality of Immigration Checkpoints in General*

A seizure occurs when a vehicle is required to stop at a checkpoint.  *See e.g. United States v. Fraire*, 575 F.3d. 929, 931 (9th Cir. 2009).  While a seizure is normally

---

[8]The Court's references to narcotics herein includes non-narcotic illegal drugs (e.g., marijuana).

unreasonable absent individualized suspicion, the United States Supreme Court has recognized that in certain situations, including some vehicle checkpoints, individualized suspicion is not required. *Id.* (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)).

The Supreme Court has determined that the government's legitimate interests advanced by a temporary seizure at an immigration checkpoint outweigh the minimal intrusion on a motorist's privacy. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561-62 (1976); *Edmund*, 531 U.S. at 37 (citing *Martinez-Fuerte*) ("We have also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens[.]"). The Court stated that it was holding "that stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." 428 U.S. at 566. As the Ninth Circuit Court of Appeals has summarized, immigration checkpoints are constitutional when they are "limited to a few brief questions about immigration, the production of immigration documents, and a 'visual inspection of the vehicle . . . limited to what can be seen without a search.'" *United States v. Preciado-Robles*, 964 F.2d 882, 884 (9th Cir. 1992) (quoting *Martinez-Fuerte*, 428 U.S. at 556-558). Moreover, a motorist may be referred to a secondary inspection area for further immigration questioning "in the absence of any individualized suspicion." *Martinez-Fuerte*, 428 U.S. at 562.

The Ninth Circuit has set forth a two-step analysis to determine whether a checkpoint set up by law enforcement is constitutional. *Fraire*, 575 F.3d at 932.

> First, the court must determine whether the primary purpose of the [checkpoint] was to advance the general interest in crime control. If so then the stop is per se invalid under the Fourth Amendment. If the checkpoint is not per se invalid as a crime control device, then the court must judge [the checkpoint's] reasonableness, hence its constitutionality, on the basis of the individual circumstances. This requires consideration of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Id.* (internal quotations and citations omitted).

The first step is to determine the primary purpose of the checkpoint and whether that

- 13 -

purpose was to advance general interest in crime control.  The government argues that the primary purpose of the checkpoint at issue was to detect illegal aliens.  Ruiz-Hernandez, however, argues that this a pretext and that general crime control and/or narcotics interdiction is the actual primary purpose.

Pursuant to the Supreme Court, "the United States has a substantial interest in controlling the flow of illegal aliens [and] [c]arrying out a program of routine stops for brief questioning at permanent checkpoints is effective in support of this interest."  *United States v. Vasquez-Guerrero*, 554 F.2d 917, 919 (9th Cir. 1977) (citing *Martinez-Fuerte*, 428 U.S. at 556.  In  *United States v. Soto-Camacho*, 58 F. 3d 408 (9th Cir. 1995), the Ninth Circuit stated:

> Except for the potential influence of drug intelligence on the decision of when within the month to activate it, the Jacumba Checkpoint does not differ in any material respect from the temporary checkpoint at Camp Pendleton that we condoned in Hernandez.  Its primary purpose is to check for aliens, all vehicles are stopped, the checkpoint is well identified, Border Patrol agents exercise no discretion over the checkpoint's operation, and the stop itself involves a minimal intrusion.

58 F.3d at 411 (footnote omitted).  In *Soto-Camacho*, the checkpoint was operational for about ten days out of each month, with "historical data reflecting trends of alien entries, alien smuggling, narcotics smuggling, and an evaluation of the peak periods of these trends" and "harvest seasons[,]" *id*. at 410, included as factors used to determine when the checkpoint would be operational.  The historical data referred to included that "a large percentage of checkpoint narcotic seizures involve alien principals (during the period from January 21, 1992 through April 24, 1994, 76% of the narcotic seizures at the Jacumba Checkpoint involved alien principals)" and that:

> Between January 21, 1992 and April 24, 1994, Border Patrol agents at the Jacumba Checkpoint made at least 322 separate illegal alien seizures and apprehended 1,544 illegal aliens.  During the same period, there were 68 seizures of controlled substances discovered in vehicles and 87 persons were arrested as a result.

*Id*. at 410-11.  After discussing *United States v. Watson*, 678 F.2d 765, 769 (9th Cir.) (*cert. denied*, 459 U.S. 1038, 103 (1982)), *Soto-Camacho* found the stop and search of Soto-Camaco had an "independent administrative justification," and "did not exceed in scope what was permissible under that administrative justification."  *Soto-Camacho*, 53 F.3d at 412,

(citing *Watson*, 678 F.2d at 771).

IV.  *Purpose of the SR80 Checkpoint*

Deputy Chief Leonard testified that the purpose of the SR80 checkpoint is for immigration inspections. This is corroborated by the agents asking the occupants of vehicles their citizenship or immigration status and inspecting identification/immigration documents. Indeed, the integrated approach (between the border, ports of entry, checkpoints, and Border Patrol stations) to border security and multi-faceted deployments (of personnel, technology, and tactical infrastructure) emphasizes the Border Patrol's focus is for immigration purposes. Further, considering the volume of traffic and the safety concerns as stated reasons for the use of checkpoints, along with the success of checkpoints, refutes claims that immigration enforcement is a pretextual purpose for the checkpoints. Additionally,  immigration officers are evaluated on a matrix related to immigration results and are trained in immigration law, nationality law, statutory law, and criminal law with a priority toward immigration law – this similarly corroborates the government's assertion the primary purpose of the checkpoints is for immigration enforcement.

Ruiz-Hernandez, however, argues that the enforcement of narcotics laws and the specific statistics in this case make the checkpoint unconstitutional.  Indeed, checkpoint stops constitute a "seizure" within the meaning of the Fourth Amendment.  *Edmond*, 531 U.S. at 34 (stop at drug checkpoint constitutes a "seizure").  However, the Supreme Court has made distinctions between checkpoints whose purpose is to control the flow of illegal aliens as compared to a checkpoint established to interdict drug trafficking. *Edmond*, 531 U.S. at 41. When law enforcement pursues general crime control purposes at checkpoints, any stop must be justified by some quantum of individualized suspicion.  *Id*. at 47.  Additionally, "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a  general scheme without individualized suspicion[.]"  *Id*. at 45. Indeed, the Ninth Circuit has stated that "where officers have broad discretion as to the parameters of the search, the addition of an impermissible motive extends the scope of the

search, regardless of whether the items searched could have been subject to a valid administrative search." *United States v. Bulacan*, 156 F.3d 963, 970 (9th Cir. 1998), as amended (Nov. 16, 1998); *see also Hernandez*, 739 F.2d at 488 (for *Martinez-Fuerte* to apply, checkpoint need not operate all the time or be at a permanent structure; important factor is lack of discretion when operated).  Except for a few known local residents, the agents consistently follow the same procedure and are not granted discretion at the SR80 checkpoint.

Ruiz-Hernandez argues that CBP has transformed the limited stop approved in *Martinez-Fuente* into a dual purpose checkpoint.  As one of those purposes is investigating illegal drug trafficking, which is not permitted under *Edmond*, Ruiz-Hernandez asserts Border Patrol has violated his Fourth Amendment rights.

In *United States v. Barnett*, 935 F.2d 178, 181 (9th Cir. 1991)  (citing *Horton v. California*, 496 U.S. 128 (1990), the Ninth Circuit stated that, although the Supreme Court's conclusion that checkpoints were constitutional in the limited immigration context, it "does not mandate an inquiry into the subjective purpose of the agent making referrals to secondary inspection, unless there is some objective evidence supporting the charges of pretext." *Id*. at 181. Indeed, the Ninth Circuit determined there was no constitutional violation where Border Patrol agents at an immigration checkpoint were cross-trained in narcotics detection. *United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993).  Further, the Ninth Circuit has concluded that intelligence regarding narcotics trafficking that affected the timing of an immigration checkpoint did not make the stop improper.  *Soto-Camacho*, 58 F.3d at 412.

There is no basis to conclude that *Edmond* implicitly overruled this line of Ninth Circuit cases.  Rather, the *Edmond* Court was discussing a checkpoint whose primary purpose was to interdict illegal narcotics.  In fact, the Court specifically stated that it was not deciding whether law enforcement could establish a checkpoint with a valid primary purpose and a "secondary purpose of interdicting narcotics." *Id*. at 47, n. 2.  Because the *Edmond* Court did not decide this issue, any reliance of Ruiz-Hernandez on *Edmond* is misplaced unless the primary purpose of the SR80 checkpoint is for general crime or narcotics

interdiction.

Additionally, the Fifth Circuit has determined, post-*Edmund*, that a checkpoint with a primary immigration purpose was constitutional "regardless of whether or not it could also be said to have a secondary programmatic purpose of drug interdiction."  *United States v. Moreno-Vargas*, 315 F.3d 489, 491 (5th Cir. 2002).  While this case does not provide precedential value, it does constitute persuasive authority.  Additionally, judges in the District of Arizona have recently concluded that a secondary purpose of drug interdiction or the use of a cross-trained canine at an immigration checkpoint does not make the immigration checkpoint unlawful or transform the checkpoint into a general crime control device.  *United States v. Wilson*, 650 Fed.Appx. 538 (9th Cir. May 27, 2016); *United States v. Romero-Cubillas*, No. CR-15-00374-TUC-RCC-LAB, 2015 WL 6579720 (D. Ariz. Sept. 25, 2015).

The Ninth Circuit has stated:

> Had [defendants] offered affirmative evidence that the first agent harbored a subjective purpose to refer to secondary inspection for drug-related offenses, we would be required to address the applicability of the cases that deal with pretextual seizures to the type of stop authorized by *Martinez-Fuerte*. [Citations omitted.] But in the absence of that evidence, we need not reflect upon the applicability of *Martinez-Fuerte* to referrals where it appears that the referral is only (or even partially) for drugs.  [Defendants] have offered no evidence why this was not a legitimate immigration stop.  The agent at initial inspection offered evidence consistent with an immigration purpose.[4]  Thus, *Martinez-Fuerte* controls.  No articulable suspicion was required.
>
> [4]*See United States v. Watson*, 678 F.2d 765, 771 (9th Cir. 1982), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982):
>
>> We assume that the administrative plan which led to the boarding of the [vessel] was motivated partly by suspicion of drug smuggling.  However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification.  Therefore, we need not consider any criminal enforcement interest the Coast Guard may have had.

*Barnett*, 935 F.2d at 181-82.

Because the Supreme Court has left open this issue and the authority before the Court allows for a checkpoint with illegal alien control as its primary purpose and general crime interdiction as a secondary purpose, the Court finds the SR80 checkpoint is constitutional.

The stated purpose of the SR80 checkpoint is illegal immigration control.  Indeed, the nature of the original questions asked of Ruiz-Hernandez by Agent Lara were immigration-related and supports a conclusion the primary purpose of the checkpoint is immigration control; i.e., no non-immigration related questions were asked prior to the request to look in the trunk. Moreover, although the statistics provided by the government establish that a majority of the arrests (52 %) for a 21-month period surrounding Ruiz-Hernandez's arrest were narcotics related (as compared to 35 % for immigration related arrests and 13 % for neither immigration nor narcotics related arrests), these statistics do not take into account the illegal immigration arrests made in the surrounding areas, the deterrence caused by the presence of the SR80 checkpoint, or the integrated, multilayered approach to border security which considers the relationships between the border, all of the checkpoints in the sector, the ports of entry, and the Border Patrol stations.  Indeed, the "formidable law enforcement problems" posed by the northbound tide of illegal entrants into the United States, *Edmond*, 531 U.S. at 25 (quoting *Martinez-Fuente*, 428 U.S. at 551-54), supports a conclusion the primary purpose of the SR80 checkpoint was to control the flow of illegal immigrants.

Further, that agents at the checkpoint enforce laws other than immigration laws  does not diminish the agents' focus and training on the identification and detection of illegal aliens.  This corroborates the government's assertion the primary purpose of the SR80 checkpoint is to control the flow of illegal aliens.  Indeed, the fact that agents also enforce laws other than immigration-related or narcotics-related (e.g., weapons offenses) supports a conclusion the primary purpose of the SR80 checkpoint is not for narcotics/drug interdiction.

Additionally, placing significant weight on a snapshot of the events and arrests at the checkpoint in a primary purpose analysis would allow for potential manipulation of law enforcement efforts by drug cartels.  If a significant percentage of arrests/seizures involving narcotics warranted a determination that a checkpoint was unconstitutional, drug cartels could arrange for significant narcotics trafficking through a specific checkpoint until it was deemed unconstitutional . . . and then more freely be able to subsequently transport narcotics

through that area after the unconstitutional checkpoint was closed.  Further, if CBP was not permitted to act on other offenses, drug cartels could potentially modify their procedures to take advantage of this failure.  As Deputy Chief Leonard testified, in such a situation, this area would become the least or less-fortified area of the 262 miles of international border within the Tucson Sector.

Therefore, where agents have only limited discretion, neither the statistics nor an additional motive of enforcing other laws are significant factor in determining the primary purpose of a checkpoint.  Here, the agents have minimal discretion.  However, the Court has considered these factors, the evidence and the circumstances presented in this case and determines the primary purpose of the SR80 checkpoint is for immigration enforcement.  The use of the checkpoint on SR80, considering its proximity to the international border and high volume of traffic (including illegal alien traffic on SR80 and in the area) is reasonable.  The public concerns and the substantial interests of the United States in controlling the flow of illegal aliens, which are significantly advanced by the use of the SR80 checkpoint (in conjunction with the integrated efforts of the Border Patrol, supports a determination the SR80 checkpoint is constitutional.  Moreover, the interference with individual liberty is minimal.  Indeed, only a few questions are asked unless there is a basis for referral to the secondary inspection area.  The Court finds the SR80 checkpoint is constitutional.

V.  *Extension of the Stop for Non-Immigration Purposes*

Ruiz-Hernandez implicitly argues that the extension of the stop to look in the trunk of the car made the search unlawful.  In other words, he asserts the stop was prolonged beyond the time beyond it was  required to ask "'a brief question or two and possibly [ask for] the production of a document evidencing a right to be in the United States.'"  *Martinez-Fuerte*, 428 U.S. at 558 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975).

In essence, it seems Ruiz-Hernandez is asserting it is unconstitutional for law enforcement, while pursuing one law enforcement goal, to potentially address alternate or

collateral law enforcement goals.  However, the Supreme Court has not limited law enforcement in such a manner in other respects.  Rather, the Supreme Court stated that it's holding in *Edmond* does not "alter the constitutional status" of the border checkpoints approved in *Martinez-Fuerte*.  531 U.S. at 47.  Indeed, the holding in *Edmond* "does not impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose."  *Id*. at 48.

Ruiz-Hernandez has not pointed to any authority, in any context, where law enforcement is precluded from taking action on a collateral law enforcement goal when they learn of it during the original encounter.   For example, a traffic officer is not required to ignore a strong odor of marijuana he notices as he is conducting the traffic violation stop.  The Supreme Court has held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop, and attend to related safety concerns."  *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015).  However, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. "The odor of marijuana emanating from a vehicle stopped during a lawful traffic stop is alone sufficient to constitute probable cause for a subsequent search of that vehicle for marijuana."  *United States v. Collier*, No. EDCR 13-19 JGB, 2015 WL 11123302, at *7 (C.D. Cal. Nov. 10, 2015) (citing *United States v. Barron*, 472 F.2d 1215, 1217 (9th Cir. 1973).  According to the Supreme Court, officers may "act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose."  *Edmond*, 531 U.S. at 48.

As the Court discusses herein, the Court finds the search of the trunk was pursuant to the voluntary consent of Ruiz-Hernandez.  As the agent acted lawfully while he was in a position he was entitled to be in, and the search was pursuant to the consent of Ruiz-

Hernandez, the Court finds the search of the trunk was constitutional.

## VI. *Consent to Search the Trunk*

"[A] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "The Fourth Amendment test for a valid consent to search is that the consent be voluntary . . ." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). A court must examine the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980); *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004). Additionally, the burden is on the government to prove that consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

The government must prove voluntary consent by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 (1974). However, "[m]ere acquiescence to lawful authority is insufficient" to constitute consent. *United States v. Spires*, 3 F.3d 1234, 1237 (9th Cir. 1993). While consent to a search may be express or implied, *Morgan v. United States*, 323 F.3d 776, 781 (9th Cir. 2003), "[t]he government always bears the burden of proof to establish the existence of effective consent . . . . This burden is heavier where consent is not explicit, since consent 'is not lightly to be inferred.'" *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984) (citations omitted). Moreover, "[u]nder certain narrow circumstances, 'courts will infer consent from the cooperative attitude [and conduct] of a defendant.'"

Five factors are relevant in the determining voluntariness of consent:

a. whether defendant was in custody;
b. whether the arresting officers had their guns drawn;
c. whether *Miranda* warnings were given;
d. whether the defendant was notified that [he] had a right not to consent; and
e. whether the defendant had been told a search warrant could be obtained.

*United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011). These factors are not exhaustive, nor is any one determinative; rather, they are "guideposts" only. *Patayan Soriano*, 361 F.3d at 502.

Here, the issue is not so much the voluntariness of the consent, but a factual dispute

as to whether Ruiz-Hernandez consented at all.  Ruiz-Hernandez points out that the government could have made/presented a video or audio recording to show what occurred or what was said – the government did not do so.  However, in considering the credibility of Agent Lara and Ruiz-Hernandez, the Court considers that Ruiz-Hernandez has more of a motive to be untruthful:  not only is he at risk of a felony conviction, but his legal permanent status may be revoked.  Additionally, the Court considers that Ruiz-Hernandez testified he does not routinely lend his car to persons for which he does not know their names, he does not know why he let the man drive the car that day, and he did not know how long the car was out of his possession; further, this occurred in the middle of Ruiz-Hernandez's commute to his employment (i.e., causing delay).  Ruiz-Hernandez's failure to provide any reason for these decisions raises additional credibility concerns.  However, the Court does find Ruiz-Hernandez's explanation of how he removed his identification (using both hands) to be credible.  Nonetheless, Ruiz-Hernandez's self-interest and vague answers as to why he allegedly acted as he did on February 19, 2016, leads to a conclusion that Ruiz-Hernandez is not credible as to the whether or not he voluntarily consented to Agent Lara looking in the trunk of the car.  The Court finds that Agent Lara does not have any significant self-interest in the outcome of these proceedings.  Further, the Court does not find the factual dispute as to where Ruiz-Hernandez's hand were during the entire encounter to undermine Agent Lara's testimony as to the conversation between Agent Lara and Ruiz-Hernandez. The Court finds Agent Lara to be credible.

The Court finds, therefore, that Ruiz-Hernandez consented to allowing Agent Lara to look in his trunk.  The consent was given while Ruiz-Hernandez was not in custody and while Agent Lara (nor any other agent) had his gun drawn.  Although *Miranda* warnings were not given, Ruiz-Hernandez was not notified that he had a right to refuse the agent's request, and Ruiz-Hernandez had not been told a search warrant could be obtained, this case does not present a situation like that in *United States v. Chan-Jimenez*, 125 F.3d 1324 (9th Cir. 1997), a case cited by Ruiz-Hernandez.  In *Chan-Jimenez*, the driver of a vehicle had pulled over to the side of the road and raised the hood of his pickup truck.  The officer pulled

- 22 -

up behind the truck, activated his emergency lights, and subsequently identified himself as a police officer.  The officer requested the driver's license and registration – he confirmed the documents were "in order."  Without returning the documents or inquiring if the driver was experiencing any problems, the officer asked if he could conduct a search and look in the bed of the truck.  While he made this inquiry, the officer had his hand on his revolver (where he kept it throughout the encounter).  The driver did not verbally respond, but moved to the rear of the truck and raised the tarp over the bed of the truck.  The Ninth Circuit stated:

> When a law enforcement official retains control of a person's identification papers, such as vehicle registration documents or a driver's license, longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the needed papers, a reasonable person would not feel free to depart.

125 F.3d at 1326.  The court considered the circumstances surrounding the encounter; i.e., the driver had stopped his vehicle on his own, the driver had raised the hood of the truck, the officer had pulled behind the truck and activated his emergency lights, the officer had his hand on his revolver, the officer had not asked if the driver was having any problems with the truck, and the officer asked for and retained the documents after determining they were in order.  The court stated, "The officer's actions made it clear that he had not simply stopped out of concern over the plight of a stranded motorist."  *Id.*

In this case, however, Agent Lara was initially focused on his designated immigration control efforts, had not completed his determination of whether Ruiz-Hernandez's documents were in order, had observed nervous behavior, and did not unholster his weapon or place his hand on his weapon.  "[T]he fact that some factors are not established does not automatically mean that the defendant's consent to search was not voluntary."  *United States v. Torres-Sanchez*, 83 F.3d 1123, 1130 (9th Cir. 1996), as amended (July 15, 1996) (citation omitted); *United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012).  As paraphrased from *Torres-Sanchez*, because Ruiz-Hernandez was not under arrest at the time consent was given, *Miranda* warnings were not necessary. The agent requested consent only after observing nervous conduct.  Furthermore, no guns or other signs of force were used to coerce consent from Ruiz-Hernandez.  "[U]pon review of the totality of the circumstances, [the Court holds]

that [Ruiz-Hernandez's] consent to search the [trunk] was voluntary." *Torres-Sanchez*, 83 F.3d at 1130.

Accordingly, IT IS ORDERED the Motion to Suppress (Doc. 50) is DENIED.

DATED this 16th day of March, 2017.

_____

Cindy K. Jorgenson
United States District Judge